**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

CLAYTON MORRIS,                             )
                                            )
                    Plaintiff,              )
                                            )       Case No. _____
        v.                                  )
                                            )       **JURY TRIAL DEMANDED**
JAMES WISE and THE HOLTON-WISE              )
PROPERTY GROUP                              )
                                            )
                    Defendants.             )

## COMPLAINT

Plaintiff Clayton Morris, for his Complaint against Defendants James Wise and The

Holton-Wise Property Group, alleges on personal knowledge as to matters relating to himself,

and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      James Wise and The Holton-Wise Property Group spread misinformation and

trade on Mr. Morris's name and rights in exchange for clicks.  They post sensationalized stories

about Mr. Morris so that, in the words of Mr. Wise, "When people Google your name they'll see

mine."

2.      This is an action to end Defendants' misappropriation of Clayton Morris's

copyright, trademark, name, and likeness, including in YouTube videos, promotional emails, and

T-shirt sales, and to compel Defendants to pay for the damage they have already caused to Mr.

Morris's reputation and business.  *See* Exs. A (screenshot of YouTube preview); B (email blast

for Defendants' promotional video); and C (T-shirt sales).  This action also seeks to stop

Defendants' invasion of Mr. Morris's privacy, wiretapping, and other unlawful acts.

3.      Clayton Morris spent nearly eighteen years as a journalist and television news

anchor, including on *Fox & Friends* and *Good Day Philadelphia*.  After finding success in real

estate investing, Mr. Morris became the host of the popular podcast *Investing in Real Estate* and,
in 2017, left Fox to focus on providing real estate investing content and services through his
*Morris Invest* YouTube channel and company.  Through podcasts, videos, books, and other
services, Mr. Morris has helped thousands learn to invest.

4.      Despite the widely positive impact that Clayton Morris has had, Defendants have
tried to capitalize on a recent misfortune, using sensationalized headlines such as "Is Clayton
Morris A Fraud" to drive searches for Mr. Morris's name to Defendants' own competing real
estate investing service.  Knowing full well that Mr. Morris did not commit "fraud" of any kind,
Defendants have nonetheless fanned the flames of public outrage to try to drive clicks to
Defendants' own websites.   Moreover, Defendants have traded on Mr. Morris's copyright,
name, and likeness and invaded his privacy to do so.

5.      For example, on October 3, 2019, Mr. Wise sent an email blast to advertise The
Holton-Wise Property Group's YouTube show *Landlords from Hell*.  This email used a
copyrighted photograph owned by Mr. Morris, a red-stamped "FRAUD" emblem, and the phrase
"Is Clayton Morris A Fraud" (shown below).



Ex. B.

6.      Clicking on this image brought consumers to a YouTube video in which Mr. Wise shared clips of what he had told Mr. Morris was an off-the-record phone conversation, disclosing, among other things, the location to which Mr. Morris had traveled with his family to escape harassment.[1]

7.      On October 4, 2018, Mr. Morris sent a notification to YouTube (which hosted Defendants' video) pursuant to the Digital Millennium Copyright Act ("DMCA") in light of Defendants' use of Mr. Morris's copyrighted photograph.  Ex. D.

8.      Two days after the DMCA notice, by October 6, 2019, Mr. Wise added a new T-shirt to his company's online storefront, where he sells clothing and other merchandise branded with slogans for his real estate investing business.  Mr. Wise used the product name "Clayton Morris Toilet Paper (WR)" for the T-shirt.  The T-shirt itself states, "I Bought This t-shirt Because They Don't Make Clayton Morris toilet paper."  The product title, description, and web address make repeated use of Clayton Morris's name to drive searches about Mr. Morris to Defendants' online store.

---

[1] The video appeared at http://www.youtube.com/watch?v=zQ1KAlDKUQE prior to its removal on October 4.



Ex. C.

9.      On October 8, Defendants provided a counternotification under the DMCA seeking to reinstate their video that used Mr. Morris's copyrighted image.  Ex. E.  Pursuant to the requirements of the DMCA under 17 U.S.C. § 512(g)(2)(C), to maintain YouTube's takedown of Mr. Wise's infringing content, Mr. Morris was required to bring the present action for copyright infringement within 10 business days of Defendants' counternotification.

10.      This is therefore an action for copyright infringement, as well as trademark infringement, misappropriation of name or likeness, violation of the right of publicity, violation of privacy, wiretapping, and statutory and common law unfair competition.  Mr. Morris seeks an injunction, actual and punitive damages, and attorney's fees for Defendants' improper attempt to trade on Mr. Morris's rights and misfortune for their own publicity.

## PARTIES

11.      Plaintiff Clayton Morris is a former journalist and news anchor who is now a real estate investor, educator, author, and host of the *Morris Invest* YouTube channel and *Investing in Real Estate* podcast.  His company, Morris Invest, helps thousands of people become more

financially independent through real estate investing.  Through his *Morris Invest* YouTube channel, he shares educational content about investing.  He maintains residence in Pennsylvania, although he is currently traveling abroad.

12.     Defendant James Wise is an individual purportedly residing in Parma, Ohio.  He is the Chief Executive Officer of Defendant The Holton Wise Property Group, a business located in Parma, Ohio that provides real estate investing services.  Mr. Wise appears in videos on YouTube for The Holton Wise Property Group and posts under his name James Wise on the website BiggerPockets.com.

13.     Defendant The Holton Wise Property Group maintains an online merchandise store hosted by TeeSpring.com, where Defendant sells T-shirts with slogans tied to Defendants' real estate business, including "Slumlord," "I [heart] Evictions," and other T-shirts with Defendants' logos.

## JURISDICTION AND VENUE

14.     This is an action for copyright infringement, arising under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 *et seq.* ("Copyright Act"), violation of the right of publicity through misappropriation of Mr. Morris's name, likeness, and voice under the common law and statutory law of Pennsylvania, including 42 Pa. Cons. Stat. § 8316, common law right of privacy, common law trademark infringement, wiretapping in violation of Ohio law, Ohio Rev. Code § 2933.65, and common law and statutory unfair competition under Ohio law, including Ohio Rev. Code § 4165.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

16.     This Court has personal jurisdiction over Defendants because they reside in Parma, Ohio, and have consented to the Court's jurisdiction under 17 U.S.C. § 512(g)(3)

5

pursuant to their counternotice under the DMCA.  *See* Ex. D.  In addition, this Court has personal jurisdiction over Defendants because, they committed all or substantially all of the acts giving rise to the claims in Parma, Ohio, specifically by generating the infringing works from the offices of The Holton Wise Property Group business and/or the home of James Wise.

17.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(a) because a substantial part of the events giving rise to the claims (including Defendants' copying of Mr. Morris's copyrighted work) occurred in this judicial district, and because Defendants reside in this district.

## FACTS

### Clayton Morris's Investing Business

18.     Clayton Morris spent nearly eighteen years as a journalist and television news anchor, including on *Fox & Friends* and *Good Day Philadelphia*.  After finding success in real estate investing, Mr. Morris became the host of the podcast *Investing in Real Estate* and, in 2017, left Fox to focus on providing real estate investing content and services through his *Morris Invest* YouTube channel and company.  Through podcasts, videos, books, public speaking, and other services, Mr. Morris has helped thousands learn to become financially independent.  Mr. Morris's goal is to share his experience as a long-time real estate investor in order to educate and inspire others to succeed in management of their own portfolios.

19.     Mr. Morris's company, Morris Invest, helps real estate investors learn to get started in investing and find investment properties.  It focuses on guiding busy investors through the confusing world of real estate, educating them and helping them find investment properties through sellers and property managers throughout the country.

6

### Oceanpointe Investments

20.     Starting in 2014, Mr. Morris hired a company called Oceanpointe Investments, founded by Bert Whalen, to perform repairs on certain houses in Indianapolis and serve as a property manager for certain rentals that Mr. Morris owned.  When Mr. Morris's clients and followers began to ask for advice about how to repair and operate rental properties in that region, Mr. Morris frequently referred them to Oceanpointe.

21.     In November 2017, Morris Invest entered into a referral fee contract with Oceanpointe.  Morris Invest also referred clients to other property management companies, depending on the regions and properties where clients had interest.  Under Morris Invest's agreement with Oceanpointe, Oceanpointe paid Morris Invest a referral fee for any buyer referred by Morris Invest who chose to purchase a property from Oceanpointe.  Oceanpointe would sell the property to the buyer, arrange for renovations, help locate a tenant, and then perform property-management services pursuant to a property management agreement with the buyer.  Under the agreement, Morris Invest was not responsible for any sales, renovation work, or property management.  Apart from the initial referral fee, Morris Invest did not earn any income from Oceanpointe or any property buyer.

22.     By early 2018, Morris Invest received some complaints regarding Oceanpointe, with some buyers stating that there were delays in completing renovations or placing tenants into houses.  Morris Invest questioned Oceanpointe about the buyers' concerns.  However, Oceanpointe told Morris Invest that the complaints were merely the result of a temporary backlog given the high number of referrals.

23.     Nonetheless, in an effort to help reduce what Oceanpointe claimed was just a backlog, Morris Invest began to work directly with contractors and managers on a number of these projects.  Morris Invest spent its own money on a number of properties to help the buyers it

7

referred, paying contractors to complete renovations so that tenants could be placed in these homes.  Because Oceanpointe never repaid or compensated Morris Invest for any of these repairs, Morris Invest lost a significant amount of money as a result of these events, such as hundreds of thousands of dollars of contractor bills that Morris Invest paid.

24.     By the spring of 2018, Mr. Morris learned that Oceanpointe was not just backlogged but that it had failed to perform repairs and property-management services on a number of properties in the Indianapolis region and purportedly lacked the funding to perform repairs despite buyers paying for those renovations up-front at closing.  Mr. Whalen failed to turn over rent money and failed to perform promised repairs on a number of houses.  All along, Mr. Whalen and Oceanpointe lied to Mr. Morris and Morris Invest, telling them that houses were being properly managed and rental payments made.  Believing Oceanpointe's reports, Mr. Morris and his family continued to purchase properties from Oceanpointe for their own personal investments as recently as March 2018.  Mr. Morris and his family lost hundreds of thousands of dollars of their own money on homes purchased from and mismanaged by Oceanpointe.

25.     When Mr. Morris learned of Oceanpointe's mismanagement, Mr. Morris severed his and Morris Invest's relationship with Oceanpointe.  Moreover, Mr. Morris did what he thought best to protect buyers and the public from Oceanpointe's actions:  Mr. Morris reported Oceanpointe to the Indiana Attorney General.  Having spent nearly half a million dollars already to help buyers referred by Morris Invest who were harmed by Oceanpointe, Mr. Morris knew that he needed help to make things right and to require Oceanpointe to satisfy its obligations.

26.     In early 2019, several news outlets ran articles about the losses caused by Oceanpointe in the Indianapolis market.  Mr. Morris and his family began to face repeated harassment including violent messages and phone calls.

27.     Mr. Morris has worked hard to counteract the negative impact of Oceanpointe's actions.  However, when Defendants create videos that knowingly sensationalize versions of these events to falsely frame Mr. Morris as having knowledge of or involvement in Oceanpointe's conduct, Mr. Morris and his family face not only undeserved loss of reputation but continued harassment as well.

**Defendants' Repeated Requests for Mr. Morris to Appear in Their Video Were Denied**

28.     In April 2019, James Wise reached out to Mr. Morris on Instagram, first with public comments aimed to "get Mr. Morris's attention," and then private direct messages about Mr. Morris's relationship with Oceanpointe.  Mr. Wise asked Mr. Morris if he would appear in a video that Defendants were making about Mr. Morris's dealings with Oceanpointe.  Mr. Morris declined to appear in the video.

29.     Mr. Morris agreed, however, to a phone call with Mr. Wise on the condition that it would be "off the record."  Mr. Wise agreed that the phone call with Mr. Morris would be "off the record."  When Mr. Morris called Mr. Wise, Mr. Morris again reiterated that the call would be "off the record" and could not be made public.  Mr. Wise agreed.

30.     On the April phone call, Mr. Morris explained that he was lied to and deceived by Oceanpointe and had no involvement in the misconduct alleged against Oceanpointe.  Mr. Morris pointed Mr. Wise to several sources who could confirm Mr. Morris's version of events.

31.     On the April phone call, Mr. Wise told Mr. Morris that making videos about Mr. Morris would drive traffic to Defendants' competing real estate business, stating, to the best of Mr. Morris's recollection, "Look, this is going to help me sell more houses. When people Google your name, they'll see mine."

32.     Mr. Wise also stated that he makes a lot of money from YouTube traffic, and making videos about Mr. Morris would help his business.  Mr. Wise predicted, "My channel size

9

will likely be at your size by the end of the year."  Mr. Wise told Mr. Morris that he is a

businessman, so, "You get it."  Mr. Wise noted that Defendants had been targeting

advertisements for their competing real estate business so that they would run in front of Mr.

Morris's real estate investing YouTube videos.

33.     At the end of the call, Mr. Wise stated that he nonetheless understood Mr.

Morris's side of the events and that it would be good for Mr. Morris to get that out in the video.

Mr. Wise stated, to the best of Mr. Morris's recollection, "I'm completely changing my

viewpoint on this.  You were simply a referral partner who got hosed by this guy Bert Whalen.

That's the guy that should've been punished.  It doesn't make any sense that you would ruin your

reputation and this guy Bert would make all the money.  I'll give you a platform to share this

side of the story. Anyone with a brain would see what happened.  Your side of the story just isn't

out there."

34.     Mr. Wise again asked if Mr. Morris would appear in his video.  Mr. Morris stated

he most likely would not want to be interviewed or appear in the video, but he was willing to

review a list of preapproved questions if Mr. Wise emailed him.

35.     In a follow-up email, Mr. Wise reiterated that he understood Mr. Morris's side of

events.  Mr. Wise wrote, "Simply put I don't think you made enough money for anyone to

reasonably believe you were complicit in being the fall guy of the scam."  Mr. Wise again urged

Mr. Morris to appear in the video.

36.     In the intervening months, Mr. Wise frequently posted on the website

BiggerPockets.com, a real estate investing online forum, about Mr. Morris.  Despite knowing

that Mr. Morris did not commit any wrongdoing, Mr. Wise's comments urged investors not to

work with Mr. Morris and insulted those who did.  For example, in August 2019 in response to a

question from another user about whether to use Mr. Morris's company, Mr. Wise pointed the user to a comment thread Mr. Wise wrote titled, "Clayton Morris / Morris Invest House of Cards starting to fall," and stated, "If after going through that entire thread you are still interested in buying from them you sir are an animal."



Ex. F.

   37.  Mr. Wise called Mr. Morris again in September.  His tone was aggressive.  Mr. Wise stated that he would give Mr. Morris "one last chance" to appear in his video.  Mr. Morris stated that had seen many of Mr. Wise's <u>BiggerPockets.com</u> comments since their conversation in the spring and believed that Mr. Wise was becoming increasingly predatory.  Therefore, Mr. Morris again stated that he was not interested in appearing the video.

   38.  Nonetheless, Mr. Morris reiterated to Mr. Wise that there are many sources that could verify that Mr. Morris was lied to by Oceanpointe, had no intent to mislead anyone, and did not commit any wrongdoing.  Mr. Wise responded, "I'm not your [expletive]—I'm not your errand boy."

   39.  In later communications, Mr. Morris again declined to appear in Defendants' video, reminding Mr. Wise of his previous statements indicating that Defendants merely sought to capitalize on Mr. Morris's misfortune to increase their own Google traffic.

### Defendants' Misappropriation of Mr. Morris's Rights and Invasion of His Privacy

40.     In a desperate attempt for clicks, Defendants have used Mr. Morris's copyright, trademark, name, likeness, and voice to drive searches for Mr. Morris's name to Defendants' own competing real estate investing service.

41.     Defendants use "Clayton Morris" and other terms referencing Mr. Morris in advertising, keywords, and video and post titles to drive internet traffic to Defendants and target advertising for Defendants' business such that Defendants' advertising will appear when users try to search for and view videos created by Mr. Morris.

42.     On October 3, 2019, Mr. Wise sent an email blast to advertise The Holton-Wise Property Group's YouTube show *Landlords from Hell*.  This email used a copyrighted headshot photograph owned by and depicting Mr. Morris,[2] accompanied by a red-stamped "FRAUD" legend and the phrase "Is Clayton Morris A Fraud" (shown below).



---

[2] The copyright in the photograph was registered with the Copyright Office to Clayton Morris under registration number VA 2-173-971.

Ex. B.

43.     Defendants use Mr. Morris's voice extensively in their video without obtaining a release or consent from Mr. Morris.

44.     The audio clips of Mr. Morris used in Defendants' videos were obtained from what Mr. Wise told Mr. Morris were off-the-record conversations.

45.     Mr. Morris reasonably expected the phone conversations to remain private and not to be used in any public video, particularly given that Mr. Morris repeatedly declined Mr. Wise's requests to appear in Defendants' videos.

46.     Mr. Morris's name, likeness, and voice all have established commercial value due to Mr. Morris's career as a television news anchor, audio podcaster, and video host.

47.     In addition to Defendants' videos, Defendants sell a T-shirts using the Clayton Morris name on their online merchandise store.  On October 5, 2019, Mr. Wise added a new T-shirt to his company's online storefront, where he sells clothing and other merchandise branded with slogans for his real estate investing business.  The T-shirt states, "I Bought This t-shirt Because They Don't Make Clayton Morris toilet paper."  The product title, description, and web address make repeated use of Clayton Morris's name.  Ex. C.

48.     Defendants' use of Mr. Morris's copyright, trademark, name, likeness, and voice are intended to increase Defendants' internet traffic and advertising revenue and drive business to Defendants' real estate investing services.

49.     Defendants' use of "Clayton Morris" on their website and in keywords for the website are intended to drive searches for Mr. Morris's name to Defendants.

**Morris's Cease and Desist Request**

50.     To stop Defendants' misappropriation of Mr. Morris's copyrighted work, on October 4, 2018, Mr. Morris sent a notification to YouTube (which hosted Defendants' video)

pursuant to the Digital Millennium Copyright Act ("DMCA").  This takedown notification

requested removal of Defendants' video located at

http://www.youtube.com/watch?v=zQ1KAlDKUQE, titled "Is Fox News Anchor Clayton

Morris a FRAUD? – Landlords From Hell 2 – Trailer #ThisIsHoltonWise."

51.     On October 8, Defendants provided a counternotification under the DMCA seeking

to reinstate their video.

52.     Pursuant to the requirements of the DMCA, to maintain YouTube's takedown of

this content, Mr. Morris was required to bring an action for copyright infringement within 10

business days, which Mr. Morris has timely done by bringing the present suit.

## COUNT I

### Copyright Infringement
### 17 U.S.C. § 101, *et seq.*

53.     The foregoing paragraphs are incorporated as if fully set forth herein.

54.     Plaintiff Clayton Morris is the sole and exclusive owner of the copyrighted work

titled "Photograph - Clayton Morris personal headshot," which was created in 2015 and first

published in 2016.  The copyright in the work is registered as copyright registration number VA

2-173-971, with an effective date of registration of October 10, 2019.

55.     As the owner of the copyrighted image, Plaintiff owns the exclusive rights to copy

the work, to prepare derivative works based on the work, to display the work, and to distribute

copies of the work by sale or other transfer of ownership, or by rental, lease, or lending.

56.     Defendants have used Mr. Morris's copyright image, created derivative works

based on the work, and used the work to generate revenues for Defendants without Plaintiff's

authorization.

14

57.     Defendants' acts constitute infringement of Plaintiff's copyrighted work in violation of the Copyright Act, 17 U.S.C. § 101 *et seq*.

58.     Such infringement by Defendants was deliberate, reckless, and willful.

59.     Plaintiff is entitled to recover from Defendants his actual damages and/or Defendants unlawful profits.

60.     Defendants' conduct has caused Plaintiff irreparable harm.  Unless restrained and enjoined, Defendants will continue to commit acts of infringement and cause Plaintiff to suffer substantial injuries, loss, and irreparable damage to his proprietary and exclusive rights to his copyright.  Plaintiff's remedy at law is inadequate to fully compensate him for these inflicted and threatened injuries.

61.     Plaintiff is entitled to a permanent injunction, as provided for in 17 U.S.C. § 502, enjoining Defendant and all others acting in concert with her from engaging in further acts of infringement.

## COUNT II

### Misappropriation of Name, Likeness, or Voice
### 42 Pa.C.S.A. § 8316 & Common Law

62.     The foregoing paragraphs are incorporated as if fully set forth herein.

63.     Mr. Morris's name, likeness, and voice all have established commercial value due to Mr. Morris's career as a television news anchor, audio podcaster, and video host.

64.     Mr. Morris has placed significant investment into the commercial value of his name, likeness, and voice, including by making use through Mr. Morris's YouTube videos and podcasting work.  Mr. Morris is frequently paid for appearances and speaking engagements, further establishing the commercial value of his name, likeness, and voice.

65.     Defendants derived advantage and benefit from the unauthorized use of Plaintiff's name, likeness, and voice, including in Defendants' YouTube videos, promotional emails for Defendants' videos and business, and T-shirt sales.

66.     Defendants unlawfully used and misappropriated Plaintiff's name, likeness, and voice without obtaining a grant of rights or Plaintiff's or an authorized representative's consent, for commercial and advertising purposes.

67.     Defendants intended to realize financial benefit and/or realized such benefit by their unauthorized use of Plaintiff's name, likeness, and voice in its marketing and promotional materials so as to drive business to its real estate investment services and increase T-shirt sales.

68.     As a result of Defendants' unauthorized use of Plaintiff's name and likeness, Plaintiff has sustained loss or injury, including, but not limited to, depreciation of the value of his name, likeness, and voice in connection with future commercial profits.

69.     Additionally, Defendants had actual knowledge that they were using Plaintiff's name, likeness, and voice without any right, license or permission. Accordingly, Defendant knowingly misappropriated Plaintiff's name, likeness, and voice.

70.     Plaintiff seeks damages for all injuries, damages and losses resulting from Defendants' misappropriation, including, but not limited to, damages for the fair market value of use of Mr. Morris's name, likeness, and voice, damages for good will, and for the value that use of Mr. Morris's name, likeness, and voice brought to Defendants, and the diminution of value of Mr. Morris's name, likeness, and voice connection with future commercial pursuits.

71.     Plaintiff also seeks injunctive relief in the form of an order requiring Defendants to cease and desist from using Clayton Morris's name, likeness, or voice on any video, website, T-shirt sales, or advertising or promotional material in connection with Defendants.

72.     Defendants' acts constitute a violation of Plaintiff's right of publicity including under 42 Pa.C.S.A. § 8316 and the applicable common law.

## COUNT III

### Right of Privacy
### Common Law

73.     The foregoing paragraphs are incorporated as if fully set forth herein.

74.     Defendants' use of Mr. Morris's name, likeness, and voice without consent in Defendants' videos, promotional materials, and website constitute a violation of Mr. Morris's right of privacy, including in violation of Pennsylvania common law or other applicable common law rights.

75.     Defendant unlawfully misappropriated Mr. Morris's name, likeness, and voice, by using his name, likeness, and voice in Defendants' YouTube videos, promotional emails for Defendants' videos and business, and T-shirt sales.

76.     Defendant used Mr. Morris's name, likeness, and voice in this regard for the purpose of appropriating the commercial benefit that is particularly associated with Mr. Morris's name, voice, and likeness; specifically, the commercial value and reputation Mr. Morris has developed through videos, podcasting work, and paid speaking appearances.

77.     As a direct and proximate result of said unlawful conduct, Mr. Morris's privacy was invaded, and he suffered damages to his reputation, good will, emotional harm, and loss of future earnings.

78.     Further, said misappropriation was done intentionally, willfully and wantonly such that an award of punitive damages is warranted.

## COUNT IV

### Trademark Infringement

17

**Common Law**

79.     The foregoing paragraphs are incorporated as if fully set forth herein.

80.     Mr. Morris has a common law trademark right in the name Clayton Morris for real estate investing services, videos, websites, books, and other services providing real estate investing information, among other goods and services.

81.     Mr. Morris has continuously and actually used the name Clayton Morris in connection with real estate investing services, videos, websites, books, and other services providing real estate investing information, among other goods and services for at least 3 years or since 2017.

82.     The Clayton Morris name has developed secondary meaning in these contexts as referring to goods and services produced, authorized, sponsored, or licensed by Plaintiff Clayton Morris. The primary significance of the name Clayton Morris in connection with real estate investing services, videos, websites, books, and other services providing real estate investing information in the minds of the public is to identify the source of these goods and services.

83.     Without Mr. Morris's consent, Defendant has used Plaintiff's Clayton Morris trademark in commerce in connection with Defendant's sale, offers of sale, distribution, promotion and advertisement of their goods and services bearing infringements of Plaintiff's Clayton Morris trademark.  For example, Defendants use Clayton Morris' trademark in video and webpage titles to drive business to Defendants' competing websites and YouTube channels or to Defendants' t-shirt sales.

84.     Defendant's actions likely have caused and will continue to cause confusion and mistake and to deceive potential customers and the general purchasing public as to the source,

origin, or sponsorship of the infringing videos, websites, and other content and are likely to deceive the public into believing that the infringing content originates with, is associated with, is sponsored by, is endorsed by, or is authorized or licensed by Clayton Morris, all to the damage and detriment of Mr. Morris.

85.     Defendant's infringement has been and continues to be intentional, willful, and without regard to Mr. Morris's exclusive rights in the trademark.

86.     As a result of Defendant's conduct, Mr. Morris has suffered and, unless Defendant's conduct is preliminarily and permanently enjoined, will continue to suffer, actual damages and irreparable harm as to which they have no adequate remedy at law.

87.     Because Defendant's actions have been willful, Mr. Morris is entitled to an award of costs and, this being an exceptional case, enhanced damages and reasonable attorneys' fees.

## COUNT V

### Wiretapping
### Ohio Rev. Code §§ 2933.52, 2933.65

88.     The foregoing paragraphs are incorporated as if fully set forth herein.

89.     Defendant intercepted, disclosed, and intentionally used oral communications with Mr. Morris in violation of Ohio Rev. Code §§ 2933.52 and 2933.65 by recording multiple phone calls between the Defendant and Mr. Morris and then using them in Defendant's videos for unlawful purposes.

90.     Mr. Morris did not give prior consent to Defendant to intercept, disclose, and intentionally use these phone calls.

91.     Defendant intercepted these oral communications with Mr. Morris for the purpose of committing tortious and injurious acts; specifically, to infringe Mr. Morris's copyright and

trademark rights, to misappropriate Mr. Morris's name, likeness, and voice, to invade Mr.

Morris's right of privacy, and to commit torts of unfair competition.

92.     Plaintiff seeks damages for all injuries, damages and losses resulting from

Defendants' wiretapping, including, but not limited to: liquidated damages computed at a rate of

two hundred dollars per day for each day of violation or liquidated damages of ten thousand

dollars, whichever is greater; damages for the diminution of value of Mr. Morris's name,

likeness, and voice connection with future commercial pursuits and for emotional distress;

damages for good will, and for the value that use of Mr. Morris's name, likeness, and voice

brought to Defendants; and attorney's fees and other litigation expenses incurred in bringing this

action.

93.     Further, said wiretapping was done wantonly, recklessly, and maliciously such

that an award of punitive damages is warranted.

## COUNT VI

### Unfair Competition
### Ohio Rev. Code § 4165 and Common Law

94.     The foregoing paragraphs are incorporated as if fully set forth herein.

95.     Defendants engage in unfair competition in violation of the common law and Ohio

statutory law, including by passing off the goods or services of Mr. Morris and disparaging the

goods and services of Mr. Morris.

96.     Defendants owe Mr. Morris actual damages for loss of the goodwill in and

commercial value of Mr. Morris's name and likeness.

97.     Defendants' conduct was willful, entitling Mr. Morris to attorney's fees.

98.     Plaintiff also seeks injunctive relief in the form of an order requiring Defendants to cease and desist from using Clayton Morris's name, likeness, or voice on any video, website, T-shirt sales, or advertising or promotional material in connection with Defendants.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the following relief be granted:

1.     Grant a permanent injunction enjoining Defendants and anyone acting in concert with Defendants from copying, displaying, or distributing any unauthorized copy of, or derivative work based on Clayton Morris's copyrighted image, misappropriating Plaintiff's name, likeness, or voice, distributing authorized recordings of Plaintiffs' voice for an unlawful purpose, and/or engaging in unfair competition;

2.     Award Plaintiff his actual and punitive damages for Defendants infringement, misappropriation, and harm, or other damages on all Counts, in an amount to be determined at trial;

3.     Award Plaintiff attorneys fees and costs for the present action;

4.     Grant to Plaintiff such other relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues.

Respectfully Submitted,

Dated:  October 22, 2019              */s/ Katharine Jones*

**WILMER CUTLER PICKERING
   HALE AND DORR LLP**

Katharine Jones (0082389)
3139 Research Boulevard
Dayton, Ohio 45420
Tel.: (937) 395-2100
Fax: 937-395-2200
katharine.jones@wilmerhale.com

Christa Laser (*pro hac vice* application to be filed)
1875 Pennsylvania Ave NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
christa.laser@wilmerhale.com

Louis W. Tompros (*pro hac vice* application to be filed)
60 State Street
Boston, MA 02109
Tel.:  (617) 526-6000
Fax:  (617) 526-5000
louis.tompros@wilmerhale.com

*Attorneys for Plaintiff Clayton Morris*

## **VERIFICATION**

I, Clayton Morris, declare as follows:

I am the plaintiff in the above-entitled action;

I have read the foregoing Complaint and know the contents thereof;

The Complaint and its contents are true to the best of my knowledge, except as to matters alleged upon information and belief, and as to those matters I believe them to be true.

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  28 U.S.C. § 1746.

Executed on October 21, 2019        _____

                                                            Clayton Morris